IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JTH TAX, INC. d/b/a
LIBERTY TAX SERVICE, *et al.*,

      Plaintiffs,

      v.

GREGORY AIME, *et al.*,

      Defendants.

Civil Action No. 2:16cv279

## OPINION & ORDER

This matter is before the Court following a bench trial held January 11, 2017 through January 13, 2017 between Plaintiffs JTH Tax, Inc. d/b/a Liberty Tax Service and SiempreTax+, LLC ("Plaintiff[1]") and Defendants Gregory Aime, Wolf Ventures, Inc. d/b/a Wolf Enterprises, Aime Consulting, LLC and Aime Consulting, Inc. ("Defendants"). After the trial, the Court **SET ASIDE** the Temporary Restraining Order, **DENIED** Plaintiff's Claims,[2] and **GRANTED IN PART** Defendants' Counterclaims.[3] The Court entered Judgment in favor of Defendants and against Plaintiffs JTH Tax, Inc. d/b/a Liberty Tax Service and SiempreTax+, LLC, jointly and severally, in the amount of $2,736,896.17. These findings of fact and conclusions of law explain the Court's reasoning.

---

[1] JTH Tax, Inc. d/b/a Liberty Tax Service and SiempreTax+, LLC are both Plaintiffs, but for clarity only, the Court refers to them collectively as "Plaintiff."

[2] Plaintiff's claims in the Amended Complaint, Doc. 6, include Count 1: Breach of the Franchise Agreements; Count 2: Breach of the Purchase and Sale Agreement; Count 3: Breach of Covenant Not to Compete; Count 4: Federal Trademark Infringement; Count 5: False Designation and Misrepresentation of Origin; Count 6: Federal Trademark Dilution; Count 7: Misappropriation of Trade Secrets; Count 8: Request for Preliminary Injunction; Count 9: Request for Permanent Injunction; and Count 10: Conversion.

[3] Defendants' counterclaims in the Verified Answer, Affirmative Defenses, and Counterclaim, Doc. 43, include Count 1: Breach of Contract; Count 2: Breach of Implied Covenant of Good Faith and Fair Dealing; Count 3: Actual Fraud; and Count 4: Anticipatory Breach of Contract.

## I.   FINDINGS OF FACT

**A.   Franchise Agreements, the PSA, and the EFIN Extension**

Plaintiff is a tax preparation company.  Defendants have been franchisees of Liberty Tax and SiempreTax+ locations since about 2011.  As of 2016, Defendants operated nine (9) franchise locations (hereinafter "Business") and a centralized processing center.  Defendant Gregory Aime owns Defendant Wolf Ventures, Inc. d/b/a Wolf Enterprises and manages the company as an entity through which he operated the Franchises.  In about January 2016, Plaintiff learned that the Internal Revenue Service ("IRS") revoked the Electronic Filing Identification Number ("EFIN") for Defendants' Franchises as a consequence of Defendants' activities.  Defendants were required to maintain a valid EFIN under their franchise agreements with Plaintiff.  Plaintiff could have terminated the franchise agreements under the terms of the contract, but instead executed a Purchase and Sale Agreement ("PSA") with Defendants[4] on January 21, 2016.  Under the PSA, Plaintiff purchased Defendants' Franchises and gave Defendants until May 8, 2016 to obtain a valid EFIN and buy back the Business.  As a result of the PSA, Plaintiff operated these franchises as company stores as of the closing date, January 21, 2016.

The PSA terminated all of the franchise agreements between the Parties, except for the agreements' post-termination obligations.  Notably, the post-termination obligations included a covenant not to compete with Plaintiff and instructed Defendants to: remove all of Plaintiff's marks from the Business; pay all debts owed to Plaintiff; deliver all customer and company information, files, and tax returns to Plaintiff; and transfer all telephone numbers to Plaintiff.[5]

---

[4] Specifically, Plaintiff executed the Purchase and Sale Agreement with Wolf Ventures, Inc. and Gregory Aime, individually and as President of Wolf Ventures, Inc.  Doc. 6, Ex. L at 1.

[5] This is not a comprehensive list of the post-termination obligations.  This list serves as a summary of the post-termination obligation and includes the provisions at issue in this litigation.

The post-termination obligations also instructed Defendants to assign the leases associated with the franchises to Plaintiff, upon Plaintiff's request and the lessors' consent.

In the PSA, Plaintiff is listed as the "Purchaser" and Defendants are listed as the "Seller." The PSA defines the term "Business" as Defendants' nine (9) Franchises. The PSA provides that Purchaser agrees to buy all of the "tangible and intangible assets of the Business" for $1,107,580.36. Doc. 6, Ex. L ¶ 1. At the time the PSA was executed, Defendants owed Plaintiff $1,075,893. The PSA states that "[a]t Purchaser's request, Seller shall seek the Lessor's consent to the assignment of all office real estate leases connected with the operation of the Business to Purchaser or its assignees." Id., Ex. L ¶ 6(g). In the PSA, the Parties agree that "[a]ll expenses and liabilities arising out of or related to the Business, which arise from the moment of Closing and thereafter shall be the responsibility of the Purchaser." Id., Ex. L ¶ 2. Further, the PSA provides that "if Seller buys back the Business . . . , Purchaser agrees to pay to Seller the Adjusted Net Profits . . . from the operation of the Business from the date of Closing through resale of the Business back to Seller." Id., Ex. L ¶ 4.

To effectuate a buyback of the Business, the PSA instructs that Seller must provide Purchaser with written proof of a valid EFIN from the IRS by May 8, 2016, execute a separate purchase and sale agreement between the parties, and comply with Purchaser's standard sales and approval process. Id., Ex. L ¶ 4. Seller would necessarily have to execute a new franchise agreement with Plaintiff for each of the nine (9) franchise locations. Notably, a new franchise agreement with Plaintiff carries a usable term of five (5) years.

Prior to January 21, Mr. Aime employed Sergio Jean-Louis and Marie Fletcher in running his franchise business. Specifically, Mr. Jean-Louis helped Mr. Aime manage the Business as the Chief Operating Officer of Wolf Ventures, Inc. Mr. Aime hired Ms. Fletcher as

3

an independent contractor to assist in setting up a processing center. The processing center served to review and verify that all tax filings created by the Business complied with governing laws and regulations before filing with the IRS.

On January 21, 2016, a representative of Plaintiff emailed Mr. Aime that Plaintiff "will not be putting your utilities and leases in our name at this time. We will however be paying those bills." Pl. Ex. 41. As such, Defendants did not begin to assign the leases associated with the franchises to Plaintiff at that time. At some point, Plaintiff began to entertain the prospect of selling the Business to Mr. Jean-Louis, rather than proceeding with Mr. Aime's buyback opportunity, as provided for in the PSA. Notably, Mr. Jean-Louis filed a franchise application with Plaintiff on January 21, 2016, which is the same day as the PSA was signed. On January 22, 2016, representatives of Plaintiff called Mr. Jean-Louis and informed him that he was no longer employed by Wolf Ventures, Inc., but would be employed by Plaintiff as a District Manager. As District Manager, Mr. Jean-Louis was instructed to supervise the Business as Plaintiff's company stores with Mr. Aime's former staff. Plaintiff's representatives also informed Mr. Jean-Louis during that call that Mr. Aime was banned from entering the Business.

On January 26, 2016, Mr. Aime and Ms. Fletcher met with John Hewitt, President and CEO of Plaintiff, in Virginia Beach. At that meeting, Mr. Aime told Mr. Hewitt that he likely could not obtain a valid EFIN by the PSA's May 8, 2016 deadline. Mr. Hewitt informed Ms. Fletcher that, as of January 26, 2016, she would work for Plaintiff as a District Manager. As District Manager, Ms. Fletcher was tasked with overseeing certain stores, including the franchises that make up the Business.

On February 5, 2016, the IRS notified Mr. Jean-Louis that his EFIN application was approved. Mr. Jean-Louis subsequently informed Plaintiff's corporate office that he had

4

received a valid EFIN. On March 3, 2016, a representative of Plaintiff emailed Mr. Jean-Louis about the potential purchase of the Business. To purchase the Business, Plaintiff required that Mr. Jean-Louis agree to numerous terms, including that he "understand[s] that Liberty is not committing to any future approval of any participation by Mr. Aime in the operation or ownership of the offices, regardless of his future EFIN status." Def. Ex. 16. Additionally, Mr. Jean-Louis had to complete a franchise application and a background check, the Business had to pass an audit, and Mr. Hewitt had to approve the transfer of the Business from Plaintiff to Mr. Jean-Louis. Mr. Jean-Louis subsequently agreed to Plaintiff's terms, passed a background check, and submitted an additional franchise application.[6] All of the franchises that comprise the Business passed Plaintiff's audit.

On April 8, 2016, Ms. Fletcher met with Mr. Hewitt in Florida to interview for a position at Plaintiff's corporate headquarters. During this meeting, Ms. Fletcher asked Mr. Hewitt whether he would go forward with selling the Business to Mr. Jean-Louis. After informing Ms. Fletcher that Plaintiff would not move forward with Mr. Jean-Louis, Mr. Hewitt asked Ms. Fletcher about Mr. Aime's progress toward obtaining a valid EFIN. Ms. Fletcher told Mr. Hewitt that Mr. Aime would likely receive a valid EFIN by the end of 2016. In response, Mr. Hewitt agreed to extend the EFIN deadline in the PSA from May 8, 2016 to December 31, 2016. Mr. Hewitt instructed Ms. Fletcher to communicate this EFIN extension to Mr. Aime. On the following day, April 9, 2016, Ms. Fletcher called Mr. Aime to notify him of the EFIN deadline extension. At trial, Defendants introduced Mr. Hewitt's calendar and emails from his executive assistant that confirmed the meeting between Mr. Hewitt and Ms. Fletcher on April 8, 2016. On April 20, 2016, Mr. Aime thanked Mr. Hewitt in an email for "graciously allowing me to extend my PSA agreement until December. What steps should I take to move forward with extending

---

[6] Mr. Jean-Louis submitted franchise applications on January 21, 2016 and February 12, 2016.

5

the PSA[?]" Doc. 109, Ex. A. On April 28, 2016, Mr. Aime sent an additional email to Mr. Hewitt in which Mr. Aime asked "[W]ould you like to switch leases over and handle a buyout or will you extend my PSA agreement and work things out with the buyback?" Pl. Ex. 9. Mr. Hewitt did not respond to either of Mr. Aime's emails. On May 2, 2016, Plaintiff promoted Ms. Fletcher to Director of Company Stores.

At some point after the PSA was executed, Plaintiff requested that Defendants assign the leases for the franchises that comprise the Business to Plaintiff. Defendants offered Plaintiff a form assignment for franchise leases, but the Parties were unable to agree on the specific language and provisions to be included in the assignment. On June 17, 2016, Mr. Aime changed the entry passcode to his centralized processing center. On July 1, 2016, Ms. Fletcher met with Mr. Hewitt to discuss the operation of the Business. Shortly thereafter, on July 5, 2016, Plaintiff terminated Ms. Fletcher. On September 15, 2016, the IRS issued Mr. Aime and Wolf Enterprises a new valid EFIN. On September 20, 2016, Mr. Aime notified Plaintiff and this Court of the new valid EFIN.

## B.    Expenses

In managing the Business as company stores for Plaintiff, Mr. Jean-Louis paid for utilities and other operating expenses with Wolf Ventures, Inc.'s credit card, which Mr. Aime paid off. Mr. Jean-Louis submitted associated expense reports for such costs, some incurred pre-PSA and others incurred post-PSA, and these expense reports were approved by John Ducom, Director of Company Stores for Plaintiff. Despite approving such expenses, Plaintiff did not reimburse Defendants.[7] Additionally, while Plaintiff operated the Business as company stores

---

[7] While the PSA states that pre-PSA expenses related to the Business are to be the responsibility of Seller and post-PSA expenses are to be the responsibility of the Buyer, the Court found that many of the pre-PSA costs listed in the expense reports to be properly associated with the operation of the Business during the 2016 tax season. As such,

after executing the PSA and retained revenues generated from such operations, Plaintiff stopped making rent and certain utility payments for many of the franchises on March 29, 2016.[8]  Mr. Aime, on behalf of Defendants, paid these rent and utility bills.   Notably, Mr. Aime paid considerable rent, utilities, and other operating expenses for the Business without reimbursement after the PSA closing, through the May 8, 2016 EFIN deadline, and beyond.   At trial, during rebuttal, Plaintiff called Bradford Tibbs, Director of Internal Audits for Plaintiff, to rebut Defendants' contention that Defendants paid certain rent and expenses.   The Court, however, found such rebuttal evidence unpersuasive.

## II.    CONCLUSIONS OF LAW

### A.    Breach of the PSA

The evidence establishes that Plaintiff and Defendant entered into a valid and enforceable contract, the PSA, and that Plaintiff was the first party to breach the terms of that agreement.  In Virginia, the "elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; (3) and injury or damage to the plaintiff caused by the breach of obligation.'"   JTH Tax, Inc. v. Berg, No. 2:14cv543, 2015 WL 893353, at *5 (E.D. Va. Feb. 27, 2015) (quoting Squire v. Va. Hous. Dev. Auth., 758 S.E.2d 55, 60 (Va. 2014)).   "Generally, a party who commits the first breach of a contract is not entitled to enforce the contract."  Horton v. Horton, 254 Va. 111, 115 (1997). Specifically, if the initial breach is material, the other party to the contract is excused from performing his contractual obligations.  Id.  "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform the obligation defeats an essential purpose of the contract."  Id.

---

and because the expense reports were approved by Plaintiff, Plaintiff was responsible for reimbursing Defendant for such expenses.
[8] At certain franchise locations, Plaintiff stopped making utility payments prior to March 29, 2016.

"In Virginia, every contract contains an implied duty of good faith and fair dealing." Enomoto v. Space Adventures, Ltd., 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). When parties to a contract create valid and binding rights, "an implied covenant of good faith and fair dealing is inapplicable to those rights." Ward's Equip., Inc. v. New Holland N. Am., Inc., 254 Va. 379, 385 (1997). "[A]lthough the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." Va. Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 542 (4th Cir. 1998).

   *i.   Plaintiff Breached the PSA First*

Under the terms of the PSA, Plaintiff was responsible for all "expenses and liabilities arising out of or related to" the Business after the PSA closing date.  Doc. 6, Ex. L ¶ 2. Specifically, Plaintiff was required to pay or reimburse expenses approved by Plaintiff and incurred by the Business after January 21, 2016.  Additionally, Plaintiff was required to pay for rent and utilities for the Business after the closing date.  As of March 29, 2016, however, Plaintiff breached the PSA and stopped paying for rent and expenses related to the Business.  On April 20, 2016, Plaintiff approved six (6) expense reports submitted by Mr. Jean-Louis.  These expense reports consisted of operating expenses for the Business during the 2016 tax season. Plaintiff never reimbursed Defendants for these expenses, also in breach of the PSA.  The expense statements submitted by Plaintiff demonstrate that Plaintiff never paid any utilities at three (3) locations.  Further, Defendants introduced evidence indicating that Defendants paid rent that Plaintiff had agreed to pay.

Additionally, Plaintiff agreed in the PSA to pay Defendants $1,107,580.36 to purchase the Business.[9] The PSA provides that this amount "shall be paid on May 15, 2016." Doc. 6, Ex. L ¶ 3. At the time the PSA was executed, Defendants owed Plaintiff $1,075,893. Thus, Plaintiff was obligated to pay Defendants $31,687, representing the balance of the purchase price, on May 15, 2016. Plaintiff has never paid Defendants this amount, in breach of the PSA. Defendants changed the entry passcode to the processing center, in contravention of this Court's Temporary Restraining Order, but did so on June 17, 2016, long after the numerous aforementioned breaches by Plaintiff.

Plaintiff's course of conduct throughout the dispute and during the trial indicates that Plaintiff did not respect or recognize Defendants' right to repurchase the Business. Despite the PSA's definition of "Business" as being the nine (9) franchise locations transferred by Defendants to Plaintiff, and the buyback provision's use of the word "Business" as what would be transferred back to Defendants, Plaintiff argued it had no obligation to sell back all of the franchises that comprise the Business. Additionally, on the same day Plaintiff executed the PSA, Plaintiff also accepted an application from Mr. Jean-Louis to acquire the Business and followed up with the necessary steps to finalize the sale of the Business to him on March 3, 2016, long before Mr. Aime's option date of May 8, 2016. These acts, combined with Plaintiff's failure to pay the aforementioned expenses associated with the Business or to contact the landlords or the utilities of the Business to find out what was owing, demonstrate to the Court that Plaintiff looked upon the PSA as a piece of paper that they could do with as they pleased and that Plaintiff was the first party to breach the PSA.

---

[9] In the PSA, Purchaser agrees to buy all of the "tangible and intangible assets of the Business" for $1,107,580.36. Doc. 6, Ex. L ¶ 1.

    *ii.   Defendants Did Not Compete with Plaintiff; Were Instructed to Keep Signs Up and to Not Assign Leases*

Despite representation to the contrary at the hearing on the temporary restraining order, Plaintiff offered no evidence that Defendants were competing with Plaintiff in violation of the post-termination obligations of the franchise agreements, the PSA, or this Court's Temporary Restraining Order. Additionally, the evidence presented at trial demonstrated that Plaintiff affirmatively instructed Defendants to keep Plaintiff's marks and signs up at the franchises.[10] Notably, if Defendant bought back the Business or if Plaintiff operated the Business as company stores, either operator would likely continue to use the signage. Finally, Plaintiff instructed Defendants to not begin to assign the leases associated with the Business for some period of time.[11]

**B.    EFIN Extension**

    *i.   EFIN Deadline was Extended from May 8, 2016 until December 31, 2016*

The deadline for Defendants to obtain a valid EFIN and buy back the Business was extended from May 8, 2016 until December 31, 2016. The basis of that finding is the testimony of witness Marie Fletcher, which went unrebutted by Plaintiff. The Court found Ms. Fletcher's testimony regarding her April 8, 2016 meeting with Mr. Hewitt credible. Further, Ms. Fletcher's testimony was corroborated by the production of Mr. Hewitt's calendar and his executive assistant's emails to Ms. Fletcher, both of which confirmed that such meeting occurred.[12]

---

[10] On August 11, 2016 Plaintiff's attorney emailed Defendants' attorney that Plaintiff is "okay with the signs staying up for now." Def. Ex. 40.

[11] On January 21, 2016, a representative of Plaintiff emailed Mr. Aime that Plaintiff "will not be putting your utilities and leases in our name at this time." Pl. Ex. 41.

[12] In pretrial motions, the Defendant argued that dinner meeting involving Mr. Hewitt and Ms. Fletcher never took place and further that, if it took place, Mr. Hewitt did not make the statements attributed to him by Ms. Fletcher. Doc. 32 at 1–2; Doc. 51 at 2, 16; Doc. 69 at 1.

The EFIN extension is also supported by the April 20, 2016 email from Mr. Aime to Mr. Hewitt in which Mr. Aime thanked Mr. Hewitt for "graciously allowing [him] to extend [his] PSA agreement until December." Doc. 109, Ex. A. On April 28, 2016, Mr. Aime sent an additional email to Mr. Hewitt in which Mr. Aime asked "would you like to switch leases over and handle a buyout or will you extend my PSA agreement and work things out with the buyback?" Pl. Ex. 9. This email, however, does not affect Mr. Aime's acceptance of Mr. Hewitt's offer to extend the EFIN deadline.

The extension of the EFIN deadline is further supported by the course of conduct of Mr. Aime, who continued to pay rent and expenses for the Business after the PSA closing and past the original May 8, 2016 EFIN deadline. Finally, the EFIN extension is supported by the inference the Court draws from the failure of Mr. Hewitt, President and CEO of Plaintiff, to appear before this Court in person or by deposition.[13] The Court infers from such failure that Mr. Hewitt's testimony would have been contrary to the position taken by Plaintiff at this trial. Scott v. Watsontown Trucking Co. Inc., 533 Fed. App'x 259, 263 (4th Cir. 2013) ("As the Supreme Court of Virginia has explained, the missing witness instruction is a statement of the settled rule that the unexplained failure of a party to call an available material witness gives rise to an inference, sometimes called a presumption, that the testimony of such absent witness would be adverse to such party." (quoting Neeley v. Johnson, 215 Va. 565 (1975))). For these reasons, the deadline for Defendants to obtain a valid EFIN and buy back the Franchises was extended from May 8, 2016 until December 31, 2016.

*ii.  The Statute of Frauds Does Not Impact the EFIN Extension*

---

[13] At trial, Plaintiff moved the Court to allow the introduction of Mr. Hewitt's deposition testimony, but later voluntarily withdrew such motion. The Court, therefore, did not rule upon the admission of the deposition.

The Statute of Frauds does not apply to the EFIN extension based on the underlying facts of this case. Specifically, this case involved a contract, namely the PSA, which would be performed within one year. The lengths of the leases associated with the Business do not render the EFIN extension subject to the Statute of Frauds because the leases were not automatically transferred to Plaintiff, but rather would only be transferred at the request of Plaintiff. Doc. 6, Ex. L ¶ 6(g) ("At Purchaser's request, Seller shall seek the Lessor's consent to the assignment of all office real estate leases connected with the operation of the Business to Purchaser or its assignees."). Notably, Plaintiff not only did not timely request that these leases be assigned, but stated in communications between the Parties that such leases should not be assigned, which is consistent with the evidence in this case.

Additionally, this case did not involve a suretyship contract where a party was made to answer for the debts of another. Plaintiff's purchase price under the PSA was simply offset against Mr. Aime's debt to Plaintiff. Also, Mr. Aime relied upon Plaintiff's verbal promise of an EFIN extension to his detriment. Such reliance serves as another reason why the Statute of Frauds would be inapplicable to this case. T--- v. T---, 216 Va. 867, 872 (1976) (stating that "a party may be estopped by his statements or conduct from pleading the statute of frauds." To establish equitable estoppel, a party must show "that the person to be estopped has misled another to his prejudice.").

Finally, the evidence presented establishes that Plaintiff itself treated verbal directions as amendments to the PSA in Plaintiff's dealings with Mr. Jean-Louis. Specifically, on January 22, 2016, representatives of Plaintiff called Mr. Jean-Louis and instructed him that Mr. Aime was banned from entering the Business. This term does not appear anywhere in the PSA. Further, despite its steps to sell the Business to Mr. Jean-Louis, there was never an attempt to amend the

PSA even though the Plaintiff stated in its March 3, 2016 email to Mr. Jean-Louis that it would not be bound to accept Mr. Aime as even a part owner. These steps were all undertaken before May 8, 2016. As such, the oral promise to extend the deadline for Mr. Aime to obtain a valid EFIN is not affected by the Statute of Frauds.

Based on the forgoing reasons, the Court **SET ASIDE** the Temporary Restraining Order and **GRANTED** Defendants' Counterclaims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing. The Court need not consider Defendants' Counterclaims for Anticipatory Breach of Contract or Actual Fraud. The Court **DENIES** Plaintiff's Claims in their entirety. Finally, any provisions of the franchise agreements or the PSA restricting competition between Plaintiff and Defendants or compelling the transfer of any leases or utilities are void and unenforceable.

## C. Damages

The Court entered Judgment in favor of the Defendants in the amount of $2,736,896.17. This Judgment is comprised of the adjusted net revenues for tax season 2016 and future lost profits. The Judgment is reduced by the amount of money owed by Defendants to Plaintiff. Due to Plaintiff's breaches, Defendants were not given the opportunity to repurchase the Business. To calculate damages, however, the Court assumes[14] that Defendants would have repurchased the Business, as the evidence presented corroborates this view. In computing Defendants' damages, the Court does not consider the purchase price in the PSA because that price would never have been paid had the Business been conveyed to Defendants. The PSA provides that "if Seller buys back the Business . . . , Purchaser agrees to pay to Seller the Adjusted Net Profits . . .

---

[14] All of the evidence before the Court indicates that Defendants would have repurchased the Business if given the opportunity by Plaintiff, which translates into continuing the operation of the franchises for the balance of their existing terms, as opposed to obtaining new five (5) year terms. Although there is some evidence to support the argument that they were entitled to new five (5) year terms, the Defendants presented evidence based upon the more conservative view.

from the operation of the Business from the date of Closing through resale of the Business back to Seller." Id., Ex. L ¶ 4.  The Parties recalculated the 2016 adjusted net profits during this period to be $1,373,262, see Agreed Ex. 13(d), when the royalty adjustment was applied.

To calculate future lost profits, the Court first examined the Business' past performance. The Court noted Defendants earned: $721,702 in gross receipts with five (5) franchises during the 2012 tax season; $1,394,950 in gross receipts with seven (7) franchises during the 2013 tax season; $2,859,611 in gross receipts with seven (7) franchises during the 2014 tax season; and $5,270,963 in gross receipts with eight (8) franchises during the 2015 tax season.  On January 21, 2016, Plaintiff purchased Defendants' nine (9) franchises and the processing center.  Plaintiff earned $4,166,702 in gross receipts during the 2016 tax season.  The above demonstrates that Defendants' Business is not a new business, but rather an established one which had been extremely successful with substantially increased revenues in every year under Defendants' operation.  The Court found the information available sufficient to reliably project Defendants' future income had Plaintiff given Defendants the opportunity to repurchase the Business. TechDyn Sys. Corp. v. Whittaker Corp., 245 Va. 291, 298 (1993) (instructing that damages due to a breach of contract can be recovered "only to the extent that the evidence affords a sufficient basis for estimating their amount in money with sufficient certainty") (quoting Boggs v. Duncan, 202 Va. 877, 883 (1961)).

If Defendants elected to repurchase the Business, Plaintiff was obligated to return all of the franchises.  Additionally, the Parties would have to execute new franchise agreements for each location.  As Plaintiff acknowledged at trial, a new franchise agreement with Plaintiff carries a usable term of five (5) years.  Defendants, however, conservatively computed future lost profits on the basis of how much time was remaining on Defendants' franchise agreements

as of trial.  Also, Defendants did not project any increase in gross revenues, despite substantial increases on a per store basis in every year that Defendants operated the Business.  Additionally, the Court believes any potential double payment of bills by Plaintiff is more than compensated for by the Defendants' conservative estimate of their future lost profits.  By multiplying the 2016 adjusted net profits of the nine (9) franchises, including the negative cost of the processing center, by the remaining years of each location's franchise term, less Defendants' debt to Plaintiff, Defendants calculated future lost profits to amount to $1,363,634.17.  The Court did not discount the future damages to arrive at their present value, again, due to the Defendants' conservative computation of such damages.  Nor did the Court award interest on Defendants' debt to Plaintiff as the evidence at trial established that the debt was a consolidated amount of the balance due on different loans, and the Plaintiff introduced no evidence of the interest rate upon any of the loans and offered no computation of interest or claim for same.  The damages recoverable for 2016 adjusted for royalty payments to Plaintiff is $1,373,262.  The total of the two elements of damage is $2,736,896.17.  As such, the Court **GRANTS** Judgment in favor of the Defendants and against Plaintiffs JTH Tax, Inc. d/b/a Liberty Tax Service and SiempreTax+, LLC, jointly and severally, in the amount of $2,736,896.17.

The Court **DENIED** Defendants' request for punitive damages as Defendants failed to produce evidence that entitled Defendants to such damages.  Additionally, the Court **DENIED** Defendants' request for attorney's fees as Defendants did not offer evidence to deviate from the American Rule, which instructs that each party bears its own costs involved in litigation.  Additionally, because Defendants did not formulate a liquidated amount of damages until late in the trial, the Court **DENIED** prejudgment interest.  The Court **ORDERS** that interest shall accrue at the judgment rate from that date of the Judgment of January 13, 2017.

### III.    CONCLUSION

For the foregoing reasons, the Court **SET ASIDE** the Temporary Restraining Order, **DENIED** Plaintiff's Claims, and **GRANTED IN PART** Defendants' Counterclaims.  The Court entered Judgment in favor of Defendants and against Plaintiffs JTH Tax, Inc. d/b/a Liberty Tax Service and SiempreTax+, LLC, jointly and severally, in the amount of $2,736,896.17 on January 13, 2017.

The Clerk is **REQUESTED** to deliver electronically a copy of this Opinion and Order to all counsel of record.

It is so **ORDERED**.

/s/

Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
February 14 , 2017